Newman, J.
Plaintiff in error owns its right of way and tracks from Gauley Bridge, W. Va., to Kanauga, Ohio, and from Hobson, Ohio, to Corning, Ohio. Between Kanauga and Hobson, a distance of approximately 10 miles, it uses the tracks of The Hocking Valley Railway Company, under a trackage agreement entered into by and between the predecessors of these two companies. Under this agreement, it uses also the tracks of The Hocking Valley Railway Company from Hobson to Pomeroy, Ohio, and from Kanauga to °Gallipolis, Ohio, and from Armitage, Ohio, to Athens, Ohio. Mine No. 5 of The Hocking Domestic Coal Company is located on the line of The Hocking Valley Railway Company a short distance south from Hobson. The Coal Company owns mine tracks located on its own land and these tracks have a switch connection with the main track of The Hocking Valley Railway Company over the latter’s right of way. Plaintiff in error, The Kanawha & Michigan Railway Company, has a yard at Hobson and has a drill track, approximately 3000 feet in length, extending from this yard southerly, built on the right of way of The Hocking Valley Railway Company, with a crossover connection with the main track of The Hocking *419 Valley Railway Company a short distance south from Hobson. The greater portion of this drill track was built a number of years ago, and in 1912 an extension of about 880 feet was made to it on the south end by permission of The Hocking Valley Railway Company. It does not appear that any portion of this drill track was constructed on the right of way of The Hocking Valley Railway Company by reason of any provision contained in the trackage agreement under which plaintiff in error is operating between Kanauga and Hobson. This drill track is used by plaintiff in error for the purpose of switching cars in and out of its yard at Hobson. It extends to within about 25 feet of the mine tracks of The Hocking Domestic Coal Company, and while it has no physical connection with these tracks such a connection is reasonably practicable. Other mines are located along the railroad track between Gallipolis and Pomeroy, but it is admitted that plaintiff in error is not serving any of these mines.
Under the order made by the Public Utilities Commission plaintiff in error would be required to furnish cars to the Coal Company over the switch connecting the main track of The Hocking Valley Railway Company and the mine tracks, or by means of a switch connection which it would have to build between its drill track, on the right of way of The Hocking Valley Railway Company, and the mine tracks. It is the contention of plaintiff in error that it is precluded from rendering this service on account of the limitations and restrictions contained in the trackage agreement.
*420 On July 24, 1886, the predecessor of plaintiff in error, its successors and assigns, were given the right for 99 years from August 1, 1886, renewable forever, to the use in common with the predecessor of The Hocking Valley Railway Company of that part of the railroad of the predecessor of The Hocking Valley Railway Company from the city of Gallipolis to and into the city of Pomeroy and from a point about one mile west of the city of Athens to said city of Athens, “including the main tracks, sidings, passenger and freight stations, Y’s, inclines and other appurtenances and terminal and station facilities connected therewith.” In paragraph 2 of section 1 of this agreement its object is stated in the following language: “The object of this grant and lease is to enable the party of the second part [the predecessor of plaintiff in error] to make a continuous line of railway between the portion of its railroad in Ohio and the portion in West Virginia, and also enable it to operate its trains between Gallipolis and points on its own lines, and between Pomeroy and points on its own line.” In the same paragraph the following restriction is placed upon the predecessor of plaintiff in error in the use of the road between the points named: “And the party of the second part shall have no right to take any business from or to any station upon the line of the railway of the first party [the predecessor of The Hocking Valley Railway Company], except Athens, for any point reached by the railroad of the said first party or its connections.”
*421 In 1890 disputes and differences arose between the parties to the agreement as to the meaning of certain of its provisions. It was claimed that the predecessor of plaintiff in error was violating certain provisions, including the one contained in paragraph 2 which is copied above. The matter was submitted to two arbitrators under a clause in the agreement providing for such submission, and the arbitrators placed upon the agreement the construction contended for by the predecessor of The Hocking Valley Railway Company and made certain findings favorable to that company. It seems that notwithstanding these findings the violations continued and an injunction proceeding was brought in the court of common pleas of Meigs county, Ohio. The case was appealed to the circuit court, and that court, upon a hearing of the matter, stated in writing its conclusions of fact, among which was the following: “Second. The purpose and meaning of the agreement of July 24, 1886, was, and its legal construction is that, by it, the plaintiff [the predecessor of The Hocking Valley Railway Company] grants to the defendant [the predecessor of The Kanawha. & Michigan Railway Company] the right to the common use of the plaintiff’s main line of railroad as then constructed and operated between the cities of Pomeroy and Gallipolis, and all sidings and switches, that were then in use along said lines, for the general purposes of the road, and all that might thereafter be constructed by the plaintiff for the purpose of moving trains and for the common use of *422 the companies, in view of the settlement of the country, or the requirements of their business.
“It does not include or grant the use of private switches and sidings constructed before or after it was entered into, not for the convenience of the two roads, but for the convenience of shippers.”
In the decree of the court “private switch” was defined to be a switch built for the use of the individual industry carried on at that point and not to be used foy other or general railroad business.
The predecessor of plaintiff in error was perpetually enjoined from taking freight and passengers from the cities of Pomeroy and Gallipolis and from the stations and places intermediate between those two cities and from making use of any of the switches or extensions of the predecessor of The Hocking Valley Railway Company between the cities of Pomeroy and Gallipolis, except such switches and sidings as were in. existence on the 24th day of July, 1886, and were constructed and intended for joint railroad purposes, and switches and sidings of that class which might have been since constructed by the predecessor of The Hocking Valley Railway Company.
Immediately following this order of the court there is found in the decree this language: “This branch of the decree being intended to deprive defendant corporation [the predecessor of plaintiff in error] of any or all right to make use of the private switches or extensions constructed by the plaintiff corporation not for railroad purposes but for the use of shippers accommodated by such switches and sidings.” A petition in error was *423 filed in this court by the predecessor of plaintiff in error and the judgment of the circuit court was affirmed.
We think the circuit court was correct in the construction placed by it upon the limitations and restrictions contained in the agreement. We adopt this construction as controlling in dealing with the question presented here.
Counsel for The Hocking Domestic Coal Company state that the switch connection between the mine tracks of the Coal Company and the main track of The Hocking Valley Railway Company is a “private switch” upon private property and privately owned in the fullest sense those words can have in the railroad business and as they are generally understood — as distinguished from a “private switch,” also so-called, constructed by a railroad company as a railroad-owned switch. Their contention is, then, that this being the character of the switch or sidetrack in question it might well be assumed that the two railroad companies, neither of them owning it, could not dispose of such track by any contract between them — could not sell it or lease it or license the use of it to anyone. In other words, they claim that the use of this switch between the main track of The Hocking Valley Railway Company and the mine track of the Coal Company is not and could not have been intended to be restricted by this agreement. It is unnecessary to consider this claim, as the statement of counsel as to the ownership, location and control of the switch connection is not supported by the record. This switch connection *424 on the right of way of The Hocking Valley Railway Company was constructed by that Railway Company and is owned by it. This appears from the testimony of the secretary and treasurer of The Hocking Domestic Coal Company, who testified that the switch in question was put in by The Hocking Valley Railway Company and that that company maintains it back to and off its right of way.
It seems clear to us, then, that this connection between the main track of The Hocking Valley Railway Company and the mine track comes squarely within the class of “private switches” which was not included in the grant made to the predecessor of plaintiff in error.
The Public Utilities Commission took the position that under the provisions of a supplemental agreement entered into between the predecessor of The Hocking Valley Railway Company and plaintiff in error, the latter has now the right to accept freight and passengers to and from all points on said “leased line,” and inferentially held that this private switch was a part of the. leased line. The supplemental agreement is as follows:
“By the terms of a certain contract or lease entered into on the 24th day of July, 1886, between The Columbus, Hocking Valley & Toledo Railway Company, the predecessor of The Hocking Valley Railway Company, and The Kanawha & Ohio Railway Company, predecessor of The Kanawha & Michigan Railway Company, the parties of this supplemental agreement are using jointly the track of The Hocking Valley Company extending from *425 the City of Gallipolis through and into the City of Pomeroy, and including the track between Middleport Junction and Middleport, together with other tracks more specifically described in the contract or lease herein referred to, and to which reference is hereby made.
“By the terms of said lease, it is provided that the lessee company, now The Kanawha & Michigan Railway Company, shall have no right to take any business from or to any station upon the line of the leased road, except Athens, for any point reached by the railroad of the second party herein or its connections.
“It is now mutually agreed between the parties hereto, that that part of said original contract or lease hereinabove referred to, and the prohibition therein contained, are hereby waived by the party of the second part and the effect of said provision is suspended as hereinafter provided, and the party of the first part is, during the time of such suspension, to have the right to take freight and passengers to and from all points on said leased line without any restrictions whatever, and such acts on the part of the party of the first part shall not be deemed or taken in any manner as a violation of the injunction heretofore granted by the Circuit Court of Meigs County in an-action therein pending wherein The Columbus, Hocking Valley & Toledo Railway Company was plaintiff, and The Kanawha & Michigan Railway Company was defendant.
“It is expressly understood and agreed, however, that the party of the second part reserves *426 the right at any time, after the expiration of thirty days’- written notice to the party of the first part, to cancel and annul this contract, and thereupon all rights granted hereunder shall cease, and thereafter the party of the first part shall be required to observe the terms and conditions of said contract or lease of July 24th, 1886, and of the order made by said Court, in the same manner and to the same extent as if this contract had not been made.”
Plaintiff in error, as we have seen, had been enjoined from taking freight and passengers from the cities of Pomeroy and Gallipolis and from stations and places intermediate between those two cities. As we read this supplemental agreement, it simply removes the traffic restriction as to business on the line of the leased road. It does not grant to plaintiff in error additional facilities for operating its road. The facilities which it had the right to use were defined by the circuit court. It was specifically pointed out in the decree of that court that the agreement did not include or grant the use of private switches and sidings constructed before or after it was entered into, not for the convenience of the two roads, but for the convenience of shippers.
Our holding is that plaintiff in error under the limitations and restrictions contained in the track-age agreement has no right to the use of the switch connection with the mine tracks of The Hocking Domestic Coal Company, nor has it any authority to use the right of way of The Hocking Valley Railway Company in making a connection between *427 its drill track and the mine tracks of the Coal Company.
But it is urged by counsel that even though plaintiff in error is prevented by the restrictions and limitations in the trackage agreement from rendering the service which the Coal Company is seeking, yet such an agreement is against public policy and void.
It is not claimed that the service rendered by The Hocking Valley Railway Company to The Hocking Domestic Coal Company, or any of the shippers on the portion of its line which it has leased, is rendered less prompt or less efficient on account of any provision contained in the track-age agreement. No complaint is made that a less number of trains is operated or that a less number or cars is being furnished by The Hocking Valley Railway Company on account of the use of its facilities by plaintiff in error, or that The Hocking Valley Railway Company is attempting to narrow its obligations, or relieve itself of any of the duties imposed upon it as a common carrier. The object of the agreement was to connect the disconnected portions of the railroad of plaintiff in error and to make a continuous line between that portion in Ohio and that portion in West Virginia. We know of no statute which would require The Hocking Valley Railway Company to grant the use of its facilities for that purpose. When it granted the use of its tracks and sidings between Gallipolis and Pomeroy, it did so voluntarily, subject, however, to certain limitations and restrictions. It is not likely that a trackage arrangement would have *428 been consented to without those limitations and restrictions, and it may be that in the absence of such an arrangement plaintiff in error would be unable to connect the disconnected portions of its railroad, as the business between the two points named may not be sufficient to warrant the building of a connecting line. No doubt the failure of plaintiff in error to have a continuous line of railroad would be to the disadvantage of the patrons on its own line and of the public generally. As was said in Alford v. C., R. I. & P. Ry. Co., 3 I. C. C. R., 519, 533: “Running arrangements like the one in question, and with like restrictions, exist in many other parts of the country, and are of great service in transportation. In some instances in large cities several companies run their trains over the tracks of one company for through business, but take no local business from the company that gives the privilege. It has never been shown that this practice injures any one, or that it is not in the public interest. It certainly saves a large expenditure for parallel lines and for terminal rights in cities. A decision adjudging such arrangements unlawful could only demoralize transportation to a large extent and prove prejudicial to carriers as well as to the public.”
We see no valid legal objection to this agreement. Similar agreements have met the approval of the supreme court of the United States in a number of cases, among which are Union Pacific Ry. Co. v. C., R. I. & P. Ry. Co., 163 U. S., 564, and Chicago, R. I. & P. Ry. Co. v. Denver & R. G. Ry. Co., 143 U. S., 596.
*429 While the instant case was pending in this court, the Interstate Commerce Commission dismissed a complaint filed by The Hocking Domestic Coal Company against plaintiff in error here, in which the Coal Company was asking the commission for an order to require plaintiff in error to serve its mine as an initial carrier and furnish cars for the movement of the output of the mine to interstate destinations and to place the cars for loading over the switch track connecting the mine track of the Coal Company with the main track of The Hocking Valley Railway Company. The agreement under consideration here was before the Interstate Commerce Commission and it was held that plaintiff in error might, under the restraint of this agreement, lawfully decline to serve the Coal Company.
In that proceeding, as in this case, the contention was made that the reservation of The Hocking Valley ■ Railway Company to itself of the exclusive use of the private switch tracks was void as against public policy. The Interstate Commerce Commission in disposing of that contention used this language: “It is, of course, the well-settled law that a railroad may not render itself incapable of performing its duties to the public or absolve itself from those obligations without the consent of the state. It will serve no useful purpose, however, to enter upon any discussion of the cases. It will suffice to say that the authorities clearly establish the doctrine that an owning and operating railroad may give trackage rights to another carrier over a part of its line, where such a. *430 grant does not impair the performance of its own duties to the public as a common carrier, and, in the absence of a controlling statute, that the owning carrier may, by the terms of the agreement, prohibit the grantee from exercising its functions as a common carrier with respect to traffic upon the line of track so granted. Such provisions do not impair the common carrier obligations of the grantee on its own line, and the grant may indeed enlarge the ability of the grantee carrier to serve patrons on its own line. The general principles will be found stated at some length in Union Pacific Ry. Co. v. Chicago, etc., Ry. Co., 163 U. S., 564, 593, 594, 595. Speaking of a similar limitation in Alford v. C., R. I. & P. Ry. Co., 3 I. C. C, 519, 531, this Commission said that the rights of the lessee with respect to the leased line 'are not the general rights of a common carrier upon its own road, but are limited and qualified by the agreement. They are simple contract rights which the law does not and can not enlarge.’ ” (44 I. C. C. R., 400.)
But it is urged, finally, and it was so held by the Public Utilities Commission, that there is a statute in Ohio which controls the situation before us, Section 8983, General Code, reading as follows: "A company whose road forms part of a line of railway between points common to another line, shall not contract or agree with any person, or other railroad company or companies, having a road or line of roads, or forming a part of a line of roads, between the same points, not to carry freight or passengers to or from such common points, nor shall it refuse to receive or *431 carry freight or passengers brought to it to be so carried.”
The Public Utilities Commission says that the duty of a,common carrier operating a line of railroad in common with another is defined in this section and that the agreement upon which, plaintiff in error relies is thereby rendered void. We do not think that this statute has any application to the situation presented here. As we view it, it contemplates the existence of two actual lines of railroad between points common to each other — parallel lines, so-called. The owners of such lines are prohibited from contracting or agreeing not to carry freight or passengers to or from such common points. Plaintiff in error owns no right of way or tracks between Hobson and Kanauga. It has no line, in the sense that term is used in the statute. It is only by reason of the trackage agreement that it operates at all between those points. We do not think that such an agreement was intended to be disturbed by the statute we have quoted.
For the reasons we have given, The Hocking Domestic Coal Company is not entitled to the relief it sought. The order of the Commission is therefore reversed and the complaint dismissed.

Order reversed and complaint dismissed.

Nichols, C. J., Jones, Matthias, Johnson and Donahue, JJ., concur.